*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. SCHUDLICH, Minor.

UNPUBLISHED
March 21, 2024

No. 366765
Genesee Circuit Court
Family Division
LC No. 21-137416-NA

Before: M. J. KELLY, P.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Respondent-mother appeals by right the trial court order removing the child, SS, from her care. For the reasons discussed in this opinion, we affirm.

## I. BASIC FACTS

A few days after SS's birth, respondent took her to the hospital for breathing issues. At the time, respondent was a respondent in child-protective proceedings involving her three older children, each of whom had been removed from her care. The primary issue in the previous proceedings was respondent's inappropriate house and her ongoing, abusive relationship with her boyfriend.

The two oldest children were removed before the birth of the third child. According to a removal petition, child protective proceedings were initiated after respondent's boyfriend strangled respondent's oldest child until the child felt as if he was going to pass out. The child fled the home and was found by the police with strangulation marks around his neck. Respondent's boyfriend barricaded himself in the home and threatened to shoot the police. When he was eventually arrested, he claimed that the child had assaulted him and that the child had made the marks on his own neck. As it relates to respondent, during the police investigation, she refused to allow the police into her home, refused to allow them to question her second oldest child, and she denied that her boyfriend had assaulted her oldest child. She also refused to allow her oldest child to receive medical treatment and did not permit Children's Protective Services (CPS) to photograph his injuries. Respondent verbally agreed to a safety plan under which she would not permit her boyfriend back into the home or allow him to be around the children. Likewise, while incarcerated respondent's boyfriend agreed not to return to the home or have contact with the children. Respondent then paid his bail and he returned to her home. Respondent, apparently, opted to

-1-

remove her children from the home. Petitioner filed a petition seeking removal of the children from respondent's care, which was granted. The court also ordered that the boyfriend was not to have contact with the children.

Thereafter, respondent's third child was born at respondent's home. Respondent did not obtain a birth certificate or social security number for the child and, initially, she did not obtain a medical examination for him. Respondent's boyfriend was the child's father. After respondent agreed to take the child for a medical examination, respondent's boyfriend contacted CPS. He told them that he was going to refuse to meet with them, that he did not believe in following "government rules,' and that he and respondent were going to refuse services. He also refused to sign a safety plan. In turn, respondent refused to permit caseworkers into her home, denied permission for her oldest child to obtain medication on two occasions, did not visit her oldest child (whom she viewed as the problem), continued to reside with the boyfriend, and only expressed interest in the return of her second oldest child.

A petition was filed regarding respondent's third child after a reported instance of domestic violence between respondent and her boyfriend. According to the petition, respondent's boyfriend reported that after he caught respondent having an affair, she became violent and began beating him up. Respondent and her boyfriend later stated that it was only a verbal altercation that occurred while respondent's third child was asleep. The child was not removed from respondent's care. Instead, respondent was ordered to engage in services, including parenting classes, anger-management classes, counseling, and drug screens. She was also ordered to obtain and maintain legal income and appropriate housing, to permit caseworkers into her home, and to sign any necessary releases. Subsequently, however, it was determined that respondent continued to live with her boyfriend. Further, following a home assessment, the house was found to be under construction, to have a single, inaccessible bedroom, to have limited running water, and to have several large, unlicensed and unregistered dogs. Respondent's boyfriend refused to permit caseworkers to examine the back yard or the roof. Later, CPS received a report that respondent's boyfriend choked respondent while she was holding her third child. Respondent initially left the home, but she stated that she wanted to return to her boyfriend. She expressed distrust of the police and refused to file a police report because she did not want her boyfriend to get into trouble. Thereafter, the third child was removed from her care. Additionally, respondent's boyfriend entered a plea of no contest to the allegations in the petition that related to him, and he was ordered to participate in various services and to allow caseworkers to access his home.

Neither respondent nor her boyfriend fully complied with the ordered services. For instance, respondent submitted to one screen, but refused to submit to others because they were a "violation of her privacy." She later submitted to 44 screens, each of which was negative. Respondent's boyfriend initially refused all screens, claiming that the caseworker was "trying to steal his DNA." Later, he submitted to 43 drug screens, testing positive for multiple illicit substances on several occasions. They both attended parenting time visits with respondent's third child. Further, respondent contacted her oldest via telephone and occasionally visited him at his placement. She regularly participated in parenting time with her second oldest child. She also completed a parenting class and a psychological evaluation and she was participating in anger-management classes and counseling. She did not benefit from participation. Rather, she continued to place her boyfriend's needs above those of her children and to blame her oldest child for the removal of her children from her care. Respondent's boyfriend completed an anger-management

course, but did not benefit. He continued to have outbursts and explosive reactions and engaged in aggressive behaviors.

It appears that, like respondent's third child, SS was not born in a hospital. However, a few days after her birth, the child was admitted to the hospital because of breathing difficulties. A CPS investigator attempted to speak with respondent and her boyfriend at the hospital. However, respondent's boyfriend told her that respondent would not speak without a lawyer being present. Respondent added that she would "feel more comfortable" if her lawyer were present, but she stated that she would not be able to call her lawyer. The CPS investigator contacted the caseworkers already involved in the case. From them she learned that respondent and her boyfriend had already completed parenting and domestic-violence classes, but had displayed no benefit. The caseworkers also expressed concerns regarding the domestic violence between respondent and her boyfriend. They also detailed the lack of cooperation from respondent and her boyfriend, noted that the oldest child was removed because he had been physically abused by respondent's boyfriend, who was facing felony charges stemming from the abuse. The investigator further learned that SS was ready to be discharged. As a result, she sought an emergency removal. The trial court granted an ex parte "after hours" order removing SS from respondent's care.

The next day, the referee held a hearing on the removal. The CPS investigator testified as to the prior history, including that respondent's boyfriend had physically assaulted respondent's oldest child. She also testified that respondent's third child had been left in her care on the condition that there was no contact with respondent's boyfriend but that, seven days later, it was determined that respondent's boyfriend was with the child the whole time. Moreover, respondent and her boyfriend continued to live together. Thus, if SS were released into respondent's custody, she would be placed into that environment. Another caseworker testified that there was a pattern in the case whereby respondent and her boyfriend would refuse to follow safety plans or do what they were supposed to do. She added that the issue was, and continued to be, the failure to benefit from services. She also testified that respondent's boyfriend continued to be aggressive and inappropriate with petitioner, with professionals, and with service providers. Despite that, respondent continued to stay with him. Following the hearing, the referee found that removal was appropriate. An order authorizing the petition and ordering removal of SS from respondent's care was entered.

Thereafter, a motion to review the referee's recommendation was held. At that hearing, a caseworker testified that respondent's home was not yet safe for habitation with children, another caseworker explained that respondent's boyfriend had not benefited from his anger-management and parenting-classes, and it was determined that respondent's boyfriend had refused to establish paternity of SS. The court struck respondent's boyfriend from the petition and denied respondent's motion to review the referee's recommendation. This appeal follows.

II. REMOVAL

A. STANDARD OF REVIEW

Respondent argues that the trial court erred by removing SS from her care. This Court reviews for clear error a trial court's factual findings regarding removal of a child. *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020). "A finding is only clearly erroneous if an

appellate court is left with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks and citation omitted).

## B. ANALYSIS

A child may be removed from a parent's care pursuant to MCL 712A.13a(9) and MCR 3.965(C)(2). In order to do so, the court must find by a preponderance of the evidence that:

> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.
>
> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk as described in subrule (a).
>
> (c) Continuing the child's residence in the home is contrary to the child's welfare.
>
> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.
>
> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare. [*In re Williams*, 333 Mich App 172, 182-183; 958 NW2d 629 (2020), quoting MCL 712A.13a(9) and MCR 3.965(C)(2) (quotation marks omitted).]

Although the trial court's findings need not be extensive, the court "must make a record of its findings as to each and every factor sufficient for this Court to conduct a meaningful review." *Id.* at 183.

A court may rely upon the doctrine of anticipatory neglect when making findings under MCL 712A.13a(9) and MCR 3.965(C)(2). "The doctrine of anticipatory neglect provides that how a parent treats one child is probative of how that parent may treat other children." *In re Mota*, 334 Mich App 300, 323; 964 NW2d 881 (2020). The doctrine of anticipatory neglect has little probative value if two children are situated significantly differently. *In re Kellogg*, 331 Mich App 249, 259-260; 952 NW2d 544 (2020). However, not all differences between children are dispositive given that "abuse is abuse." *In re Mota*, 334 Mich App at 323.

In this case, respondent contends that the trial court's findings supporting removal are clearly erroneous. She asserts primarily that the doctrine of anticipatory neglect does not apply because SS is differently situated from her older three children. Specifically, she points out that, unlike her siblings, SS is a newborn. Further, respondent contends that her housing has improved, she obtained employment, and she is no longer involved in domestic violence.

Yet, the risk of harm to SS in respondent's care came primarily from her lengthy history of refusing to place any of the children's needs above her relationship with her boyfriend. Respondent's boyfriend has a history of aggressive and violent behavior, which has been directed at respondent and her children. Further, he persists in his behaviors despite completing anger

management and parenting classes. The fact that there was no new *reported* domestic violence did not indicate that there was no domestic violence occurring. Thus, the evidence supports the finding that respondent's boyfriend posed a serious risk of significant harm to SS. Although there was no evidence respondent-mother personally harmed any of the children physically, the record shows that she continues to blame her oldest child for the events leading to the removal of her older children. Further, she has repeatedly demonstrated that she would not keep her boyfriend away from the children. Although being a victim of domestic violence is not, by itself, a permissible basis for interfering with respondent's parental rights, respondent's exposure of her children to harm by maintaining an abusive relationship is a proper basis for interfering with her parental rights. See *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). There was no clear error in finding that custody of SS with respondent would present a substantial risk of harm to SS's life, physical health, or mental well-being.

The evidence also established that respondent and her boyfriend had a lengthy history of refusing to comply with their caseworkers. Indeed, the record reflects that they had previously hidden respondent's children, and they refused to allow caseworkers to have contact with them even when respondent's oldest child was clearly being physically abused. Respondent argues that she was never offered a safety plan, but she had in fact been offered safety plans in the past and repeatedly flouted them. Respondent argues that the court could have ordered her boyfriend out of the home, but such an order had been imposed in the past and, again, she and her boyfriend ignored it. Moreover, respondent's house was unsuitable for a child. It had only one door, which was a fire hazard. Caseworkers were refused access to much of the house. There was no evidence that ongoing construction work was permitted or safe. And even if the house had recently gained running water, there was no reason to believe anything else would have improved without the caseworkers being able to verify that improvement. Additionally, the evidence strongly suggested that respondent's boyfriend continued to reside in the house, and respondent had an established track record of lying about whether her boyfriend was contacting the children despite a court order forbidding him from doing so. Respondent had also not benefited from her classes and was still demonstrating emotional immaturity. Contrary to respondent's argument that the caseworkers did not bother to inquire into whether she had necessities for SS or to conduct a home study, the record reflects that respondent refused to allow a home study and she declined to answer questions related to whether she had necessities for SS. Therefore, the trial court did not clearly err by finding that it would be contrary to SS's welfare to reside in the home and that nothing short of removal would ensure SS's safety.

Respondent next asserts that no reasonable efforts to avoid removal were made. As discussed, caseworkers attempted to conduct a home study and inquire into whether respondent had necessities for SS. Further, respondent's boyfriend lived in the same home as respondent and he was the father of respondent's third child. Although he was ordered not to cohabitate with respondent, he was present when a home study was attempted before respondent's third child was removed and, as reflected above, there is extensive evidence that he continued to live with her despite the no-contact order. Thus, although respondent argues that there was no emergency, the record reflects that SS was ready to be discharged, and given that respondent and her boyfriend had a history of noncompliance and disregard for safety, if petitioner had not acted immediately, there was a significant danger that not removing SS would prove dangerous to SS. There was no clear error in finding reasonable efforts had been made to prevent removal.

Respondent does not challenge the court's findings on the last factor, i.e., "[c]onditions of child custody away from the parent are adequate to safeguard the child's health and welfare." See MCL 712A.13a(9). The court's findings, however, were not clearly erroneous. SS had been placed with a relative, and there was no suggestion that the placement was inadequate to safeguard SS's health and welfare.

Affirmed.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron